ACCEPTED
12-15-00003-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
8/24/2015 2:13:06 PM
CATHY LUSK
CLERK

_____

**12-15-00003-CR**

RECEIVED IN
12th COURT OF APPEALS
TYLER, TEXAS
8/24/2015 2:13:06 PM
CATHY S. LUSK
Clerk

_____

**IN THE COURT OF APPEALS
FOR THE TWELFTH APPELLATE DISTRICT
TYLER, TEXAS**

**FILED**

8/24/2015

Twelfth Court of Appeals
Cathy Lusk
Clerk

_____

**DEQUISHA JACKSON
v.
THE STATE OF TEXAS**

_____

**APPEAL FROM THE 159TH JUDICIAL DISTRICT COURT
OF ANGELINA COUNTY, TEXAS**

_____

**BRIEF OF APPELLANT
DEQUISHA JACKSON**

_____

Respectfully, Submitted:

*/S/ John D. Reeves*

JOHN D. REEVES
Attorney at Law
1007 Grant Ave
Lufkin, Texas 75901
Phone: (936) 632-1609
Fax: (936) 632-1640
SBOT # 16723000
Email: tessabellus@yahoo.com
**ATTORNEY FOR APPELLANT**

**ORAL ARGUMENT NOT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**Parties:**

Appellant in Trial Court:

Dequisha Jackson # 01972267
Christina Melton **Crain** Unit
1401 State School Road;
Gatesville, TX 76599-

**Trial and Appellate Counsel**:

**Appellant**:

| John D. Reeves | **Trial** Jerry Whiteker | John H. Tatum II |
|---|---|---|
| Attorney at Law | Attorney at Law | Tatum Law Office |
| 1007 Grant Ave. | P.O. Box 1443 | P.O. Box 582 |
| Lufkin, Texas 75901 | Lufkin, Texas 75902 | Lufkin,Texas 75902 |
| Phone: (936) 632-1609 | Phone: 936/634-8568 | Ph: 936-639-4480 |
| Fax: (936) 632-1640 | SBOT: 21361500 | SBOT: 00789674 |
| SBOT # 16723000 | | |

**Appellee**:

| Katrina Carswell | **Trial** Katrina Carswell |
|---|---|
| Angelina County Dist. Atty | Angelina County Dist. Atty |
| P.O. Box 908 | P.O. Box 908 |
| Lufkin, Texas 75901 | Lufkin, Texas 75901 |
| Phone:  936-632-5090 | Phone: 936/ 632-5090 |
| SBOT#  10482700 | SBOT# 104822700 |

# TABLE OF CONTENTS

Page:

IDENTITY OF PARTIES AND COUNSEL……………………………………….ii

TABLE OF CONTENTS…………………………………………………… ..iii

INDEX OF AUTHORITIES……………………………………………….....iv

STATEMENT OF THE CASE…………………………………………...1-2

STATEMENT OF JURISDICATION…………………………………........2

ISSUE PRESENTED……………………………………………….......3

STATEMENT OF FACTS …………………………………………….3-26

SUMMARY OF THE ARGUMENT ……………………………………...26-27

ARGUMENT…………………………………………………………….27-36

CONCLUSION AND PRAYER…………………………………….....36

CERTIFICATE OF COMPLIANCE..................................................37

CERTIFICATE OF SERVICE……………………………………….......37

ii

# INDEX OF AUTHORITIES

Page:

## U.S. SUPREME COURT CASES

Jackson v. Virginia, 443 U.S. 307 (1979)…………………………………….28-30

## TEXAS CASES

Chambers v. State, 805 S.W.2d 459, (Tex. Crim. App. 1991)...............................29

Escobedo v. State, 6 S.W. 3d 1,  ( Tex. App.- San Antonio 1999, pet. ref'd)........29

Hooper v. State, 214 S.W.3d 9,  (Tex. Crim. App. 2007)...........................28-29,35

Johnson v. State, 967 S.W.2d 410, (Tex. Crim. App. 1998)..................................36

Kitchens v. State, 823 S.W.2d 256,  (Tex. Crim. App. 1991)................................30

Lacour v. State, 8 S.W. 3d 670, (Tex. Crim. App. 2000).......................................29

 Lucio v. State, 351 S.W.3d 878,  (Tex. Crim. App. 2011). .................................29

Moreno v. State, 755 S.W. 2d 866, (Tex. Crim. App. 1988)..................................36

Mosley v. State, 983 S.W.2d 249, (Tex. Crim. App. 1998)...................................36

Winfrey v. State, 323 S.W.3d 875, (Tex.Crim.App.2010......................................34

## RULES AND OTHER AUTHORITIES

Tex. Penal Code. Sec. 19.04 ( a) (West 2011)...……………………...............27,30

Texas Penal Code Sec. 6.03(c) (West 2011)…………...........................................30

_____

12-15-00003-CR
_____

IN THE COURT OF APPEALS
FOR THE TWELFTH APPELLATE  DISTRICT
TYLER, TEXAS
_____


DEQUISHA JACKSON
v.
THE STATE OF TEXAS
_____


APPEAL FROM THE 159th JUDICIAL DISTRICT COURT
OF ANGELINA COUNTY, TEXAS

BRIEF OF APPELLANT
DEQUISHA JACKSON

TO THE HONORABLE COURT OF APPEALS;

## STATEMENT OF THE CASE

The appellant was tried jointly with the father of their alleged child for the offenses of  manslaughter and endangerment of a child and sentenced on December 17th, 2014. Appellant was charged by indictment in the October/December 2013 term of the Angelina County Grand Jury with the offense of  murder, manslaughter and endangerment to a child allegedly committed on the

13th day of September, 2013. (CR. 19-21)  Prior to trial the state abandoned the murder charge and proceeded on manslaughter and child endangerment. The appellant pled not guilty and was tried by jury. (RR Vol.5-7)  (CR p. 84-90) Jury selection occurred on December 8, 2014. (RR Vol. 4)There were no objections to the final jury panel. (RR Vol. 4 p. 162) The jury heard the case on December 15-17th 2014. The sentencing occurred on December 17th, 2014. (RR Vol. 7).  (RR Vol. 6-7) After hearing evidence the jury found the appellant guilty and after a sentencing trial the jury recommended a sentence of 15 years in the ID- TDCJ and a $ 10,000.00 fine. (RR Vol. 6-7) The jury found the alleged father guilty of child endangerment and sentenced him to two years confinement in the State Jail Division with a $ 200.00 fine.   Thus in accordance with the jury's verdict the appellant was sentenced to fifteen years in the ID-TDCJ and a $ 10,000.00 fine. (CR 203-204) (RR Vol.7 p. 34-35, 38-39)  Notice of Appeal was filed on December 30, 2014.  (CR p. 223)  Attorney John Reeves was appointed to do the appellant's appeal on December 23, 2014. (CR 128,134)

## STATEMENT OF JURISDICTION

The Trial Court Certified Appeal for permission Appellant's unlimited right to appeal on December 18, 2013. (CR 202)

2.

## ISSUES PRESENTED

1. The evidence is legally insufficient to sustain the jury's finding of appellant's guilt for the offense of manslaughter.

## STATEMENT OF FACTS

Appellant and the father of her child were tried jointly for manslaughter and endangerment to a child. The appellant was found guilty of manslaughter and the father of the child was found guilty of endangerment to a child.

Appellant was charged by indictment in the October/December 2013 term of the Angelina County Grand Jury with the offense of Murder, manslaughter and endangerment to a child allegedly committed on the 13th day of September, 2013. (CR. 19-21)The court denied a motion for mistrial for defendants as a result of a newspaper article stating appellant was accused of murder... (RR Vol. 5, p. 4) The State eventually abandoned the murder count in the indictment and heard argument on a motion in limine regarding the admissibility of a newspaper reporting the incident as murder and that the State abandoned the felony murder charge. The Court stated it would underscore his instruction that the jury not follow the media and that counsel make no mention of the abandonment of the charge. (RR Vol. 5, p. 4, 6-7)

The case was called for trial upon an indictment charging appellant with manslaughter and child endangerment wherein the appellant entered a plea of not guilty. (RR Vol. 5, p. 24-26) The testimony considered by the jury on guilt/innocence consisted of sixteen witnesses beginning with the testimony of Desmond Garcia, a certified firefighter/paramedic with the City of Lufkin Fire Department at the time of the investigation. (RR Vol. 5, p. 37-55)

3.

Mr. Garcia testified he had been a paramedic for eight years, had attended a fire academy for four to five months, and an additional 1 1/2 to 2 years to become a paramedic (RR Vol. 5, p. 38). The paramedic responded to appellant's residence on October 11, 2013, finding the baby unclothed on the floor on his back, unclothed, in the parents' room. Mr. Tolliver, the father, was pacing back and forth, and appeared to be upset, mad, or angry and Ms. Jackson, the mother, was sitting on the bed sobbing. (RR Vol. 5, p. 41-43) The paramedic testified Ms. Bankhead; the aunt said "I told them something was wrong with the baby. The baby needed to be checked out." (RR Vol. 5, p. 45) The baby was found blue in color, cold to the touch and visibly malnourished. The paramedic said he could see his ribs and cheekbones, his cheeks were sunken in, he was in cardiac arrest, and somewhat stiff. The paramedic began resuscitation efforts, including intravenous access and established an airway. (RR Vol. 5, p. 46) His partner, Dillon Millender scooped up the baby, placed him in the back of unit and began resuscitation (RR Vol. 5, p. 48) The witness testified the people in the house did not have a sense of emergency. (RR Vol. 5, p. 52) State's Exhibit No. 1, a certified, authenticated copy of IJ's (the child's) the birth certificate was admitted. (RR Vol. 5, p. 55)

Officer Jarrod Hennigan of the Lufkin Police Department (LPD), Investigator since October 2013, and certified police officer since 2009 testified he arrived after EMS had placed the baby in the ambulance. (RR Vol. 5, p. 56-118) He stated that Ms. Bankhead told him she was woken up by Ms. Jackson saying that the child wasn't breathing and she called 911. After he found out baby was deceased, he notified Crime Scene and investigators. Crime Scene technician, Debra Walsh took additional photographs of the residence. (RR Vol. 5, p. 63-4) State's Exhibit Nos. 2 through 29, pictures of the outside and inside of the house were admitted without objection. (RR Vol. 5, p. 65-66) There were photographs of

4.

a baby bottle, cleaning wipes, a trash can with a dirty diaper, and containers of formula (RR Vol. 8).

Officer Hennigan discussed collection, storage, logging and chain of custody of evidence collected at the residence. (RR Vol. 5, p. 83-87) The witness testified that State's Exhibit 31 was Gerber oatmeal cereal and State's Exhibits 32 through 35 were various brands of formula, all being partially consumed. (RR Vol. 5, p. 87-94) He stated that the house did not have any other items for babies, but had adequate food for adults. (RR Vol. 5, p. 99-100) The Officer testified that State's Exhibit 29, a photograph of the bathroom, showed one dirty diaper in the trash can and that no diapers were found outside or in the garbage can. (RR Vol. 5, p. 100-103) However, he, himself, did not look in the outdoor garbage can and presumed if there were diapers there, someone would have taken photographs. (RR Vol. 5, p. 109) He stated that he did not look under the pile of items in the stroller, in bathroom drawers, nor under the bed. (RR Vol. 5, p. 104-110) State's Exhibits 31 through 35 were admitted. (RR Vol. 5, p. 120)

Linda Joyce Bankhead, Ms. Jackson's aunt stated that Ms. Jackson, Mr. Tolliver and the child (abbreviated I), lived with her for about a month. (RR Vol. 5, p. 120-175) Mr. Tolliver got a job with Pilgrim's Pride about two weeks after they arrived. (RR Vol. 5, p. 120-126) She had observed both parents feeding and changing the child. She suggested that the baby might grow better with cereal, but did not observe Ms. Jackson fixing the bottles. (RR Vol. 5, p. 126-130) She had encouraged the parents to take the child to a doctor, because he looked small. Ms. Jackson told her that she took the baby to the doctor, and the doctor did not see him but gave her an appointment. The appointment was three days after he passed. Her daughter, Chyrieka, and the parents would walk the baby in a stroller, and go to the park. (RR Vol. 5, p. 132-136) The parents slept on a fold out couch in the

living room and the baby slept on a baby mattress until they received a playpen, and he slept in a car seat. (RR Vol. 5, p. 136-137) She advised the parents to bathe the baby with baby wipes because he was too young. (RR Vol. 5, p. 140) When they moved in, they had a trash bag full of diapers and once she bought formula for them. (RR Vol. 5, p. 141-145)

The morning he died, Ms. Bankhead was sleeping and Ms. Jackson woke her up saying the baby wasn't breathing. She touched the baby, and he was still warm, but she didn't see his body moving, so she said they should call 911. (RR Vol. 5, p. 146-148) EMS showed up in five to ten minutes, placed the baby on the floor, and then ran out of the house with him. (RR Vol. 5, p. 148-150) Later that day Ms. Bankhead went to the police station to talk to the detective. The detective had reported that she told him that the baby was cold to the touch and stiff. She said she had only touched him, and didn't remember telling detective that he was cold and stiff. (RR Vol. 5, p. 151-153)

On Cross-Examination Ms. Bankhead stated that five adults lived in the house, Mr. Tolliver, Ms. Jackson, her son, Robert, her daughter, Chyrieka, and herself and her teen child, Z (abbreviated Z). At all times someone 15 years old or older was always with the baby. Ms. Bankhead had raised five children, would know if something was wrong, and would have called an ambulance or taken the baby to the emergency room herself if she thought anything was life threatening. She did not see anything alarming except his weight and she had pushed them to take him to a doctor. (RR Vol. 5, p. 154-157) She stated that the parents were responsive about changing his diaper and regularly fed him. (RR Vol. 5, p. 159-160)

On Redirect Examination, Ms. Bankhead stated that she had asked Ms. Jackson whether the baby was born premature because he was small. Mr. Tolliver

6.

was kind of small so she thought the baby took after his father. (RR Vol. 160-165)

On Recross Examination, Ms. Bankhead admitted that she was not aware that the Health District wrote a letter to Ms. Jackson about an appointment ten days after the child died. (RR Vol. 5, p. 166)

Ronny Harrison, LPD Communications Supervisor testified about 911 communications. (RR Vol. 5, p. 175-189) Mr. Harrison was responsible for monitoring the Communications Center, including the 911 calls and IT support for the department, including the servers, computers and software. (RR Vol. 5, p. 176) He testified about automatic recording and retention of 911 calls. (RR Vol. 5, p. 177-179)

State's Exhibit 36, a DVD of the 911 call, was admitted. Mr. Harrison described that 911 protocol is that if the call needs some pre-arrival instruction or medical intervention before the medical unit arrives, the 911 dispatch transfers the call to Montgomery County Hospital and the hospital takes over the call from that point. The 911 operator monitors the call in case the medical unit needs to ask questions until the first responder arrives on the scene, and 911 operator hangs up. (RR Vol. 5, p. 180-183) State's Exhibit 36 was published. (RR Vol. 5, p. 191)

Donna Bailey, Office Manager for Dr. Andrew Fercowitz, is also custodian of records for his office. (RR Vol. 5, p. 191-194) Dr. Fercowitz is a family practitioner, taking Medicaid patients. Ms. Bailey was aware of only one other doctor's office in Lufkin that sees small children on Medicaid, being Angelina Pediatrics. (RR Vol. 5, p. 191-192) She could not find any documents or computer records to show that I J (the child) received care at Dr. Fercowitz's office (RR Vol. 5, p. 193)

Sharon Shaw, Custodian of Records for the Health District in Angelina County, Administrator of the Health District, spoke also on behalf of the WIC

7.

program. (RR Vol. 5, p. 195-207) The WIC program stands for Women, infants and children, and is a federal nutrition program. Individuals qualify based on income, for women, pregnant women, breast-feeding women and children up to the age of five. The Angelina County Health District didn't have any records for I J (the child), but were asked to make him an appointment and transfer information from another WIC program in South Texas. His first appointment would have been on October 14, 2013, at the request of Ms. Jackson on October 4. Records were received October 9. The witness testified that Ms. Jackson received benefits from November 2012 to January 2013 in Houston, and May 2013 to July 31, 2013 in Liberty County. The documentation doesn't specify the type of services or benefits that were received. (RR Vol. 5, p. 196-198)

On Cross Examination, Ms. Shaw stated that, after requested, it takes a couple of days for electronic transfer of records and then an appointment was made. Defendant's Exhibit No. 1, copy of the WIC letter by Angela Quillin, WIC Director was admitted. (RR Vol. 5, p. 199-201)

State's Exhibit 37, medical records of San Jacinto Methodist Hospital were admitted. (RR Vol. 5, p 207-8) State's Exhibit 38, a business record affidavit pertaining to the records of the Memorial Health System was admitted subject to redaction ruling. (RR Vol. 5, p. 207-210)

Dr. Melissa Handley, is a physician employed at The Children's Clinic in Lufkin for about 14 years. She explained her history of employment and certifications and training in the field of Pediatrics. (RR Vol. 5, p. 212-269, Vol. 6, p. 5-48) She sees children four to five days a week at The Children's Clinic, and is affiliated with Angelina Pediatrics. To her knowledge, the clinics accepting Medicaid benefits in Angelina County are Angelina Pediatrics, Dr. Andrew Fercowitz and Angelina County Health District. The Dr. heard that the Health

8.

District did not see babies less than six months of age and that they would refer them to other doctors. I (the child) was not in The Children's Clinic or Angelina Pediatrics system. (RR Vol. 5, p. 216-219)

Dr. Handley was called to the emergency room as a consultant for a cardio respiratory arrest in an infant as the pediatrician on call on October 11, 2013. She arrived at the hospital in about five minutes of being paged. When she arrived, the ER physician, Dr. Monroe, was evaluating and had started resuscitation, including intubating to provide breathing support, two intravenous lines for fluids, and epinephrine, to no result. The baby had no cardiac electrical activity since its arrival. When the baby arrived his temperature was 94.7, had no pulse, no electrical activity, no spontaneous movement, and no respiratory effort. The Dr. testified that a normal rectal temperature is 99.5. Her most noteworthy observation was that the baby appeared emaciated. The medical team started resuscitation around 10:14 a.m. and pronounced the baby dead 10:40 a.m. Initially, the team wasn't sure whether there may be a response, but the baby was stiff, potentially having a seizure. But his pupils were fixed and dilated. Usually immediately after a code, newborns are still flexible. (RR Vol. 5, p. 219-224) State's Exhibit Nos. 39 through 45, photographs of the baby after treatment by Dr. Handley were admitted (RR Vol. 5, p. 226)

Immediately after the baby was pronounced dead, the medical team performed a survey. The photographs depicted a generalized loss of subcutaneous fats and muscle wasting. He was very thin with loose skin, a prominent rib cage and loss along his neckline, prominence of the clavicles and weighed five pounds and six ounces (RR Vol. 5, p. 226-228)

The Dr. initially thought the baby was premature. EMS assumed it was full term had told her that the birth weight was six pounds seven ounces. The Dr. stated

9.

it was abnormal for babies to lose weight. The photographs also showed that he had overriding sutures on his head, which is not uncommon for newborns, but infrequent in two month olds, his fontanel was a little sunken, which is consistent with dehydration, and rigor mortis, stiffening in both arms and legs. (RR Vol. 5, p. 228-230) The Dr. stated that for the most part, you can see signs of emaciation and dehydration below the neck. Above the neck you may not notice these signs. (RR Vol. 5, p. 231)

The Dr. stated that in training, they were told that rigor mortis doesn't start until maybe three to eight hours after death. Her impression from EMS was that the timeline was shorter, so she had concerns and suspicions and asked for an autopsy to be performed. The timeline she was given was that the parents handled the child for about 15 minutes before he stopped breathing, about five minutes for the ambulance to get there, ten minutes for the ambulance to get to the hospital, and fifteen minutes at the hospital. The Dr. suspected the baby died earlier than that. The Dr. explained that once rigor mortis sets in, the muscles are frozen in place in the position that you died. The Dr. stated that the EMT told her that when he arrived, the baby was in a car seat, and was crying or coughing. The Dr. couldn't deduce exactly what the noise was. The Dr. was told that the EMT picked up the baby and he wasn't breathing. But he was rigored flat, so he wasn't in a seated position. (RR Vol. 5, p. 232-233)

The Dr. stated that in the first few months of life, babies eat about one to three ounces about every two to four hours, about six to eight feedings a day. This information should be given to each mother when discharged. Parents should also be told that by day four they should be having about six to eight wet diapers a day, and if having less than five, they should call their provider. (RR Vol. 5, p. 235-238)

10.

The Dr. testified that usually newborns are started on a basic formula and most parents are sent home with that, and are instructed to stay with that formula unless instructed by a medical provider to switch. The Dr. was shown State's Exhibit No. 34, one of the containers of formula, and stated that it should take about 10 days to use that entire container. The Dr. stated that after two weeks, a lot of babies have a growth spurt and start taking more formula, like two to four ounces. (RR Vol. 5, p. 239-241)

The Dr. explained that every baby on the WIC program gets formula for free and WIC pays for it. She usually recommends picking a brand a staying with it, and only change if a provider instructs the change. But she knows parents get frustrated and try different products. The Dr. was then shown State's Exhibit 31, the Gerber oatmeal cereal. The Dr. stated that she would not recommend the cereal under four months unless instructed by a physician. She had told people to use cereal if their baby has severe reflux and they're losing weight to help the milk to stay down. She has recommended this for babies as young as two months or younger. Babies gain about six to seven ounces a week in weight from birth to three months. (RR Vol. 5, p. 242-244)

The Dr. stated that most babies lose up to three to seven percent of their birth weight after being discharged and that she asks that they to come back in two to three days after discharge to make sure they are not losing too much too quickly. Most babies are back to birth weight or above in ten to fourteen days. So it wasn't unusual for I (the child) to lose two to three ounces when discharged. (RR Vol. 5, p. 245)

The Dr. stated that a visit to their provider is recommended by the American Academy of Pediatrics in three days after discharge to re-evaluate the baby. At this visit, the Dr. checks for jaundice, heart conditions, growth, postpartum depression

11.

and how the family is adjusting to having a baby at home. In her discharge papers, the Dr. gives a list of conditions for the parents to look for, like inconsolable fussiness and crying for several hours, not feeding well, missing two or more feedings, vomiting, diarrhea, less than five wet diapers a day, or high temperature. Her discharge papers don't include anything specific about the baby having trouble breathing. She would assume parents would seek medical attention for such a condition. She tells parents to feed the baby every three hours during the day, and if they are over six pounds to let the baby wake them for feeding at night, but if under six pounds to set an alarm clock and keep feeding the baby every three hours. (RR Vol. 5, p. 246-249)

The Dr. explained that I (the child) was in the tenth percentile for height and should have weighed about nine pounds. She described signs of dehydration for babies less than three months, as a sunken fontanel, not as many wet diapers, a dry and sticky mouth, fussiness, and vomiting. The Dr. usually asks parents to look at the spit in their mouth and for wet diapers since a sunken fontanel is one of the later signs of dehydration. Signs of malnutrition might include failure to gain weight, a thin face and body, or the clothes size doesn't change. If parents complain that their baby is not eating, the Dr. often watches the baby eat, to help diagnose the issue. When shown State's Exhibit No. 28, the Dr. identified one bottle that would be appropriate for feeding a newborn. (RR Vol. 5, p. 250-253) The Dr. opined that if a parent was using half cereal and half formula, that would be very thick and would not be as nutritionally robust. (RR Vol. 5, p. 255-257)

The Dr. would be surprised to hear that the mother said that the baby ate all the time, since he should have weighed more. She would be surprised if the baby was seen in an emergency room visit four weeks earlier and would have deteriorated to this point in four weeks. She has never seen a baby this emaciated.

12.

She follows patients with weekly weights and checks until the baby is back to birth weight and gaining steadily. Sometimes she recommends supplementing, but if the baby doesn't gain weight, she believes there is an underlying problem, like a heart or lung condition. (RR Vol. 5, p. 260-264)

On Cross Examination, the Dr. stated that DiGeorge Syndrome is a genetic abnormality. She did not check for DiGeorge Syndrome, since there weren't physical signs to indicate any particular syndromes. She also saw no outward signs of physical abuse, as in burning, beating, throwing (RR Vol. 6, p. 11-13) DiGeorge Syndrome is a very rare condition that infants are born with where they have multiple immune issues, but she would have to research the symptoms. Usually thymic hypoplasia is more involved with the immune system because your thymus is immune tissue. She didn't know whether these conditions may have contributed with absorption based on an external observation. Regarding rigor mortis, according to her general training, it could set in between three and eight hours after death, but there are different variables, and an infant could get rigored faster due to age or lack of fat tissue. So she is unable to pinpoint a time of death. (RR Vol. 6, p. 13-15)

After a certain time interval after death, blood pools at the lower part of the body, if laying on its back it would pool there. This "lividity" generally takes eight to twelve hours. She did not observe lividity. (RR Vol. 6, p. 16-21)

The Dr. opined that if the parents just moved here, couldn't afford a doctor, and hadn't been accepted to Medicaid, it would be possible to fall through the cracks. In her opinion, a reasonable person would have sought care for this child. (RR Vol. 6, p. 25-27)

On Cross-Examination, the Dr. stated that after they had stopped life-

13.

sustaining support, she noted the baby was stiff. The nurse noted that stiffness had been present when she evaluated the baby. Then one of the EMTs commented that stiffness was present when he arrived. (RR Vol. 6, p. 29)

On Redirect Examination, the Dr. clarified that "time of death" is when they stop all life sustaining support, not necessarily when the baby died. Often EMTs and Dr.'s give resuscitation and the baby responds well, so they don't pronounce the child dead until support has been unsuccessful. In the Dr.'s opinion, the baby expired prior to arrival. She referred to multiple signs of death, including cooling of the body, rigor mortis and blanching on the back. The Dr. viewed State's Exhibit 43, which showed blanching where tissue is whiter where the infant was lying flat. Early blanching is not present in an infant who just passed. The Dr. stated that basic textbooks indicate this would occur about eight to twelve hours after death. Any place that the body was in contact with the surface, there would not be blood there. (RR Vol. 6, p. 33-39)

The Dr. stated that the best way to diagnose DiGeorge Syndrome and hypoplasia of the thymus would be blood work, lab evaluation, and medical history from the parents. (RR Vol. 6, p. 40)

Arturo Fernandez, Pilgrim's Pride custodian of records, discussed Mr. Tolliver's record of employment. (RR Vol. 6, p. 49-54) He stated that Mr. Tolliver was employed with Pilgrim's Pride starting October 3, 2013, working the second shift, 6 p.m. to 6 a.m., from Sunday through Saturday with two days off during the week on a rotation schedule. (RR Vol. 6, p. 51-53) On Cross Examination, Mr. Fernandez stated that employees would have insurance through Blue Cross –Blue Shield after 90 days employment. (RR Vol. 6, p. 53-54)

Dr. Candace Schoppe is a forensic pathologist employed at the Dallas County Medical Examiner's Office. She explained her education in including

14.

medical school, pathology and forensic pathology. (RR Vol. 6, p. 62-95) Forensic pathology is a branch of pathology which is a subspecialty of medicine that deals with the diagnosis of disease, specifically dealing with the determination of cause and manner of death by examining people who are deceased, who died suddenly, unexpectedly, or without an attending physician. A primary part of her job duties is performing autopsies, typically daily. (RR Vol. 6, p. 63-64)

The Dr. explained that an autopsy is a systematic external and internal examination of a body beginning with investigative information from police, photographs, or information about the scene where the body was found, and any relevant medical history. Then the Dr. looks at the outside of the body for evidence of injury or disease followed by surgical-type incisions to look at all the internal organs, including the head. The Dr. takes small pieces of tissue from all of those organs, and may look at some under the microscope. She also takes body fluids, mostly blood, fluid from the eyes and urine and does toxicology testing for drugs, poisons or medications. In certain cases they perform microbiology testing for bacteria or viruses that might be present in the blood or relevant tissues. And, especially in children, the Dr. performs additional metabolic testing. Dr. Schoppe stated that she has performed over 600 autopsies, and has testified as an expert in forensic pathology six to eight times. On October 12, 2013, she performed an autopsy on I J ( the child) at the request of Justice of the Peace Billy Ball. She observed a very small, emaciated male infant. She did not have the birth medical records until after she attempted the autopsy. She had information regarding where they found the body, how the parents found him, the EMS records and the hospital records from the prior day, some scene photographs and photographs taken nine days prior by CPS. The information she had suggested he was born a healthy male. Subsequent information confirmed that. There were no external injuries. The major

15.

findings were his extreme emaciation, fat had been almost depleted, and dehydration. He also had a green discoloration to his abdomen, his eyes were clouded and fixed, and lividity on his back. Fixed lividity is the color change that happens after death. The blood settles with gravity but not in the areas where the skin is compressed. After a few hours that fixes and the color won't change if you move the body. So they are able to tell if the body has been moved after those few hours have elapsed. State's Exhibit 43 showed red discoloration on his back with pallor over the areas that would be pressed up against something as if he was lying on his back. (RR Vol. 6, p. 65-70) The fontanel was sunken and depressed indicating dehydration. The baby was not very stiff anymore, since stiffness fades with time, but timing is difficult to assess because baby's muscles are small, and they stiffen but not in the same way adults do. Since he was emaciated he would probably be less stiff than a normal infant. (RR Vol. 6, p. 71-72) His eyes were also sunken, being another sign of dehydration. There was no evidence of congenital abnormality, disease or genetic disorders. He appeared normally developed and normally formed. (RR Vol. 6, p. 73)

Dr. Schoppe submitted the brain to the University of Texas Southwestern Neuropathology Department for examination. No findings resulted. There was no specific disease processes identified in any of the organs. Dr. Schoppe opined that any abnormal observations were a consequence of dehydration and malnutrition. (RR Vol. 6, p. 74)

Dr. Schoppe testified that his liver showed signs of malnutrition, or inappropriate caloric intake. The liver had some sort of nonspecific kind of pigmentation in the hepatocytes and to the liver cells. The autopsy noted vascular congestion in the cervical spinal cord. The Dr. stated that this was an "artifactual" finding, and had no significance. There was very little fat tissue, a factor of

16.

malnutrition. (RR Vol. 6, p. 75-76)

Dr. Schoppe stated that there was yellow fluid in his ears that looked like puss, like he may have had an ear infection. She took a culture and tried to grow any organism to determine if he had an ear infection, to no result, but that did not mean he didn't have an ear infection. The puss in the ear is unrelated to hydration status. She could not say that he consumed something. If he had consumed something within two hours before his death, she would expect to find something, but the speed that the stomach empties and how fast the food moves through the gastrointestinal system is variable. So you can't really say for sure how long ago a person ate. (RR Vol. 6, p. 77-80)

Dr. Schoppe testified that the baby also had thymic atrophy. She explained that when you are little, the thymus helps your immune system develop and it's usually pretty big. It was smaller than it should be for an infant that age. There are several reasons it can be abnormal, but one of the main reasons is malnutrition. An extremely malnourished, stressed infant is going to have thymic involution, and the thymus will shrink. Then his body was not making the immune cells it should, and more infections could result. (RR Vol. 6, p. 80-81) Dr. Schoppe stated that she did not find anything abnormal in this infant indicating that he could not absorb nutrients from the food he was eating. (RR Vol. 6, p. 82)

Dr. Schoppe requested toxicology testing for drugs, poisons and medications and found none. The fluid in his eyes indicated dehydration. Dr. Schoppe repeated the metabolic screen panel that's done on all infants are born. The baby had an abnormal increase in steroid hormones, but not so elevated to indicate a congenital disease process. She had confirmed with the State that both of his newborn screenings were negative. Increased steroid hormones are a common stress reaction that could be caused by dehydration and lack of nutrition. She discussed the results

17.

with a pediatric endocrinologist at UT Southwestern to ensure the steroid hormones weren't so elevated to indicate some sort of adrenal gland disorder which should be seen under the microscope. None of those changes in the gland were present. During the autopsy, she did not find any evidence of disease that would prevent the child from living a normal life. (RR Vol. 6, p. 83-86)

Based on the autopsy, it is Dr. Schoppe's opinion that I J (the child) died from malnutrition and dehydration. (RR Vol. 6, p. 86) State's Exhibit 46, the autopsy report, was admitted (RR Vol. 6, p. 86)

On Cross Examination, Dr. Schoppe reiterated that determining time of death is not exact. She can only give general answers based on certain findings, including the fact that the infant was stiff and lividity was fixed which would indicate that the baby was deceased at least several hours. Under certain circumstances stiffness and lividity may develop sooner, like if the baby had a fever. (RR Vol. 6, p. 89-91) The Dr. could not determine whether processed food was in the bowels. But if the baby took a couple of ounces of formula four to five hours before, you would not expect to find a lot in the stomach. (RR Vol. 6, p. 92)

On Redirect Examination, Dr. Schoppe stated that DiGeorge Syndrome is a genetic disorder and one of the findings is thymic atrophy. Usually the child has an abnormal-looking face, developmental delays, and heart defects. None of these were present in this infant other than extreme thymic atrophy. You would have to do genetic testing to definitively rule out DiGeorge Syndrome, however one would expect to see at least some of the other findings. (RR Vol. 6, p. 93-94)

On Recross Examination, Dr. Schoppe admitted that to definitively determine whether a child had DiGeorge Syndrome, chromosomal testing would be required but not routinely performed at autopsy. (RR Vol. 6, p. 94)

Nick Malone, LPD Detective for a little less than two years, employed with

18.

LPD for ten years stated that he went to Memorial Hospital upon request from the patrol officers, Officer Kevin Jackson and Officer Trent Burfine who secured the body in one of the emergency rooms. (RR Vol. 6, p. 100-128) After viewing the body, he spoke with both parents. He had arrived at the hospital approximately 11:00 a.m., after the baby had been pronounced dead.  (RR Vol. 6, p. 103) The Detective described Ms. Jackson's demeanor was somewhat withdrawn and sad, but cooperative. (RR Vol. 6, p. 103) The Detective opined that both parents had significantly less grief and were less upset than he expected. (RR Vol. 6, p. 104) Mr. Tolliver was quiet but conversational and cooperative. Both parents' stories were consistent. He spoke with Linda Bankhead, Ms. Jackson's aunt, at the police department. The family was living with Ms. Bankhead. (RR Vol. 6, p. 106) Both parents said that the child died just about the time or within 15 minutes of the 911 call. At one point Linda Bankhead described the body as cold and stiff. He observed the baby in full rigor at the hospital, which would be about an hour after death according to the parents. The Detective stated that no doctor's offices that accept Medicaid in Lufkin had any record of I (the child). Mr. Tolliver stated they moved here on August 28, 2013. I (the child) was born August 13, 2013 at Methodist Hospital in Baytown, Texas. According to the mother, he was born healthy and full term. The Detective stated that Ms. Jackson's discharge papers instructed parents to see a pediatrician within three days and provided a contact number. The Detective determined that an appointment was made, but was recorded as a no-show. Both parents stated that the baby had seen a doctor, but did not provide a name or location of a doctor visit. (RR Vol. 6, p. 107-112)

The Detective stated that Officer Jarrod Hennigan surveyed the house for dirty diapers and collected evidence. The City of Lufkin collects trash on Mondays at this residence and the Officer was there on a Friday. (RR Vol. 6, p. 113)

19.

Detective Malone interviewed Ms. Jackson at the hospital voluntarily less than an hour after he arrived. (RR Vol. 6, p. 116) State's Exhibit 47, a recording of the interview with Ms. Jackson at the hospital was admitted (RR Vol. 6, p. 117) The Detective spoke with Ms. Jackson again, voluntarily no more than two hours later that day at the police department. (RR Vol. 6, p. 117-118) State's Exhibit 48, a video interview of Ms. Jackson at the police department, was admitted (RR Vol. 6, p. 119-120) The Detective stated that Ms. Jackson exhibited a little more sadness at the hospital and that she did not seem upset at the police station. (RR Vol. 6, p. 121)

The Detective interviewed Mr. Tolliver voluntarily on the date of I' s (the child's) death at the police department. (RR Vol. 6, p. 124-125) State's Exhibit 49, a recording of interview with Mr. Tolliver at the police department, was admitted. (RR Vol. 6, p. 125-126)

State's Exhibit 50, a business record affidavit for Lufkin Fire and EMS containing the records that are relevant to October 11, 2013, was admitted (RR Vol. 6, p. 129)

Misty Davis testified that at the time she met Ms. Jackson, she did not know Ms. Jackson's baby had recently died. (RR Vol. 6, p. 129-145) In their conversation, Ms. Jackson stated that she was in jail for neglect for not feeding her baby. The witness stated that Ms. Jackson had told her that she and a 15-year old cousin of hers fed the baby. Ms. Jackson had said that she would stay up waiting for Mr. Tolliver to return home and go to bed with him. (RR Vol. 6, p. 130-131) Ms. Davis related that regarding the morning I (the child) died, Ms. Jackson told her she had heard a gasping sound from the baby and that she had moved his limbs, his arms and legs, and they were just falling. She thought he was okay, so she was trying to make him laugh. After that she gave the baby to Mr. Tolliver, and Mr.

20.

Tolliver hollered that something was wrong with the baby and that to call 911. (RR Vol. 6, p. 132)

Regarding the baby's feeding schedule, Ms. Davis related that Ms. Jackson said that throughout the night Mr. Tolliver would be at work, and that she would stay up all night. The 15-year old cousin fed the baby in the evening times, and then during the day she just slept. And when the baby started whimpering or crying when he was hungry, that she would just give him a pacifier. (RR Vol. 6, p. 133) Ms. Davis stated that Ms. Jackson told her that she had multiple different cans of formula that she kept on top of her refrigerator that different people had given her but he hadn't been to any doctor visits. (RR Vol. 6, p. 134) Ms. Davis stated "whenever you only give a baby two or three, four-ounce bottles within an eight-hour period, that's just not right." (RR Vol. 6, p. 137)

Ms. Davis testified that she notified the warden that she wanted to speak to somebody the following day. A couple of weeks later, she spoke with Detective Malone at the police station. (RR Vol. 6, p. 138) The witness thought Ms. Jackson wanted to tell her these things because she had been going to church and wanted to confess. (RR Vol. 6, p. 139) **The State rested its case in chief.**

The defense for Mr. Tolliver called Sherika Levine, Linda Bankhead's daughter, who testified that she was living at the residence at the time of the events. (RR Vol. 7, p. 4-29) At that time, she was looking for a job and school, and slept there at night. Robert Bankhead, 26, also lived there. He is mentally challenged. Her 16-year old brother, ZB also lived there, and attended school. (RR Vol., 7, p. 8-10) Ms. Levine testified that there was plenty of food and plenty of diapers in the house and that the baby didn't go without food. (RR Vol. 7, p. 11) Ms. Levine stated that she and the parents fed the baby. (RR Vol. 7, p. 12)

Ms. Levine stated that she called Angelina County Health District for an

21.

appointment, but they told her that they couldn't do anything for him until he was two months old. (RR Vol. 7, p. 13) She affirmed that Ms. Jackson has another child, KM, who is living with his father following some CPS involvement. (RR Vol. 7, p. 15)

On Cross Examination, Ms. Levine stated that she slept in the same room with Ms. Jackson, Mr. Tolliver and the baby and that most often, the baby would sleep through the night. (RR Vol. 7, p. 23) Ms. Levine viewed State's Exhibit 40, and another unidentified exhibit and stated that the baby did not look like that when she changed his diapers. She was a smaller baby, but you couldn't see his ribs and he wasn't sunken in. (RR Vol. 7, p. 25-27)

Howard Taylor is Pastor of New Templeton of Deliverance church. (RR Vol. 7, p. 29-38) His wife, Esther, is Linda Bankhead's sister. He is the landlord's manager of the residence where Ms. Jackson and Mr. Tolliver were living. (RR Vol. 7, p. 31) He loaned Mr. Tolliver and Ms. Jackson money for baby items which they bought with the money. (RR Vol. 7, p. 37)

Isaiah Tolliver testified that Kevin Mitchell has custody of Ms. Jackson's first child, K because CPS removed the child due to the parents arguing and fighting. (RR Vol. 7, p. 38-102) Mr. Tolliver is not certain that he was I's (the child's) father. His name was not placed on the birth certificate. (RR Vol. 7, p. 42-45)

When he arrived in Lufkin, he did not have a Social Security card, but obtained one. He did not have a driver's license. He did not know Ms. Jackson had Medicaid and doesn't know what it is. He moved here to do the right thing for Ms. Jackson and I. (the child) (RR Vol. 7, p. 46-47) Mr. Tolliver stated that there was always food in the house for the baby. (RR Vol. 7, p. 48) The baby wipes and diapers were stored in a green tub in the closet with items stacked on top. (RR Vol.

22.

7, p. 49)

He worked from 6 p.m. the night before I. (the child) died, to 6 a.m. the day he died. His walk home took about 30 to 45 minutes. He checked his bank card, then went to bed. He didn't know if anyone else was awake. Ms. Jackson was in the room and the baby was in his car seat next to the bed. The first day he saw I (the child), he had asked Ms. Jackson why he was so thin. Ms. Jackson told him the doctor said it was normal and they just had to give the baby some time to grow. The first time he saw him was August 28, 2013, the same day they moved to Lufkin. (RR Vol. 7, p. 50-52)

Mr. Tolliver testified that he was upset and angry because every male wants to be a father and he moved to Lufkin to be with Ms. Jackson and the baby. He didn't know if he was the father, but he took responsibility for the baby. (RR Vol. 7, p. 53-54)

Mr. Tolliver stated that he is 5'9", 140 to 150 pounds. He, Ms. Jackson and Ms. Bankhead thought the baby was small because he is small. He listened to Ms. Bankhead and Ms. Jackson because they had children. (RR Vol. 7, p. 57-59)

On Cross Examination, Mr. Tolliver stated that the baby was fed quite a bit. He wasn't aware how many ounces he was fed daily, but he was fed every time they thought he should be fed. After the baby was fed, he would sleep. He and Ms. Jackson took turns changing the diapers, probably more than six times a day. (RR Vol. 7, p. 61-62)

State's Exhibit 51, a copy of the funeral home service with Pride Respect, was admitted. (RR Vol. 7, p. 64)

On Cross Examination, Mr. Tolliver viewed State's Exhibit 51 and explained the purpose of the service was to give donations for the burial of the

23.

baby since he and Ms. Jackson were incarcerated. He signed the document as the father of the baby. (RR Vol. 7, p. 63-64)

Mr. Tolliver testified that Ms. Bankhead suggested that Ms. Jackson take the baby to a clinic to see if anything was wrong with him since he was so small. Mr. Tolliver was looking for a job, so he thought that Ms. Jackson and Sherika were attempting to take the baby to a clinic. Meanwhile, Ms. Bankhead made sure he got up every day to go look for a job. (RR Vol. 7, p. 67-70)

Mr. Tolliver stated that Ms. Jackson told him that the baby had seen a doctor before they moved to Lufkin. (RR Vol. 7, p. 70) He believed Ms. Jackson when she told him that she had fed the baby during the day and he saw her feeding the baby. (RR Vol. 7, p. 72-73)

Mr. Tolliver started working October 3, 2013. While he was looking for a job he had time to spend with Ms. Jackson and the baby. When he first saw the baby on August 28, the baby had chubby cheeks, but was skinny. Mr. Tolliver testified that when he first saw the baby, he could see his ribs just like in the photograph. (RR Vol. 7, p. 77-83)

Mr. Tolliver was at the residence when CPS came by. He didn't know the purpose of the visit. CPS took pictures and did not show any alarm at the baby's condition. (RR Vol. 7, p. 83-87)

On Redirect Examination, Mr. Tolliver stated that he had received several letters from Ms. Jackson around the time she was released. (RR Vol. 7, p. 89) Defendant's Exhibit 2, letters from Ms. Jackson to Mr. Tolliver were offered. (RR Vol. 7, p. 89)

The trial attorney read from the letters that Ms. Jackson was "so sorry I ask you to move out there and messed up you life and maybe you shouldn't be with me even though I did do what they trying to say I did. Just because of me you in jail

24.

and I am sorry." (RR Vol. 7, p. 100) From another letter, Ms. Jackson stated, "I know that we didn't do anything to hurt our baby. Our baby had food and everything." (RR Vol. 7, p. 100, 102) Defense for Mr. Tolliver rested.

The defense for Ms. Jackson called Alton Green. (RR Vol. 7, p. 102-108) The witness stated that he is a friend of Ms. Bankhead and went by the house almost daily. The witness testified that the parents always had the baby with them, they fed the baby, wrapped him up, played with him and pushed him in a stroller, just like normal people. (RR Vol. 7, p. 104-105)

The witness admitted he had been convicted of a felony for possession of a controlled substance and theft of a firearm. (RR Vol. 7, p. 106-107)

Daniale Mouton, Ms. Jackson's mother testified that Ms. Jackson had lived with her during her whole pregnancy. (RR Vol. 7, p. 108-120) Ms. Mouton stated that Mr. Tolliver stayed with her for three to four months, but moved out before the baby was born. (RR Vol. 7, p. 109)

Ms. Mouton testified that Ms. Jackson and the baby stayed with her for about three weeks and then went to Dayton. He was well fed and taken care of when staying with her. Before she left, Ms. Jackson told her she had a doctor's appointment in Dayton. (RR Vol. 7, p. 110-111)

State's Exhibit 52 and 53, photographs of the baby after discharge from hospital were admitted. (RR Vol. 7, p. 115)

Ms. Mouton did not know whether Ms. Jackson called for a three day follow up appointment, and was only aware of an appointment after he was two weeks old. (RR Vol. 7, p. 116) Ms. Mouton testified that she knew a friend drove Ms. Jackson somewhere, but couldn't say whether it was to a doctor's appointment. (RR Vol. 7, p. 117) Defense for Ms. Jackson rested.

The court read the charge to the jury. (RR Vol. 7, p. 125-136) After closing

25.

arguments, the jury deliberated. (RR Vol. 7, p. 168) The jury returned a verdict of guilty of manslaughter as charged in the indictment. (RR Vol. 7, p. 170-171) After a poll of the jury, the court recessed. (RR Vol. 7, p. 172- 174)

The trial court continued with a sentencing hearing. (RR Vol. 7, p. 176) As to Ms. Jackson, Howard Taylor was recalled. The witness stated that he had known Ms. Jackson all of her life and believes counseling would benefit her. Mr. Taylor thinks she deserves probation, she deserves a second chance. (RR Vol. 7, p. 180, 182) Ms. Jackson's trial attorney recalled Ms. Mouton. Ms. Mouton testified that Ms. Jackson had never been arrested or convicted of anything. Ms. Jackson was 18 when her baby died. (RR Vol. 7, p. 192) On July 26th, right before I (the child) was born, they buried her brother who had died suddenly due to an accident. The baby was named after Ms. Jackson's brother. Ms. Jackson is a good person and was dealing with both deaths. (RR Vol. 7, p. 193) Ms. Mouton thinks that Ms. Jackson could complete probation and get counseling. (RR Vol. 7, p. 194) Defense for Ms. Jackson rested. (RR Vol. 7, p. 196)

The trial court read the Charge of the Court to the jury. (RR Vol. 7, p. 198-204) After arguments, the jury deliberated. (RR Vol. 7, p. 218-219) The trial court sentenced appellant to confinement in the Texas Department of Criminal Justice System Institutional Division for a period of 15 years and assessed a fine of $10,000. (RR Vol. 7, p. 223)

## SUMMARY OF THE ARGUMENT

The evidence is legally insufficient to prove appellant recklessly caused

26.

the death of her child as alleged in the indictment for the offense of manslaughter pursuant to TPC Sec. 19.04. MANSLAUGHTER. (a) A person commits an offense if he recklessly causes the death of an individual.

Appellant argues even when viewing the evidence in a light most favorable to the finding of guilt by the jury that the finding is insufficient to sustain the jury's verdict and is not rational or supported by "more than a mere modicum of evidence." Appellant argues the evidence supports she should only have been found guilty as to the offense of endangerment of a child. Further, as support appellant offers the testimony of various witnesses which support the fact that appellant was not reckless regarding her feeding of the child or seeking medical attention and that only through her negligence did the child die of malnutrition. Appellant argues that her actions are of ignorance and negligence not reckless actions. Lastly, appellant argues that the evidence was not substantially any different regarding her co defendant's actions and the totality of the evidence only supported an endangerment finding in regard to the appellant.

## ARGUMENT

1.

Did the jury have enough evidence to find all the essential elements of the crime of manslaughter pursuant to Texas Penal Code Section Ann. Sec. 19.04.(West 2011) MANSLAUGHTER. (a) A person commits an offense if he recklessly causes the death of an individual.

27.

The indictment proceeded upon by the State at trial alleged the appellant did "then and there recklessly cause the death of an individual, namely I. J. ( the child) , by providing inadequate nutrition and/or fluids and/or medical care. ( CR p.19) A second count in the indictment of endangerment to a child charged that the appellant "did then and there knowingly, recklessly, or with criminal negligence, by omission engage in conduct that placed I. J. (the child) , a child younger than 15 years of age, in imminent danger of death, bodily injury, or physical or mental impairment, by failing to provide the child with adequate nutrition and/or fluids and/or medical care, and the defendant did not voluntarily deliver the child to a designated emergency infant care provider under Section 262.302 of the Texas Family Code. (CR 20-21)

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979);  Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of

28.

fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 31,supra.. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper, 214 S.W.3d at 13,supra.  Lucio v. State, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).   . Finally, it is well established that the fact finder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991

Appellant would argue that even in reviewing the evidence in a light most favorable to the verdict, it is insufficient to sustain the jury's finding of guilt.  As this court is well aware  "legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction." Escobedo v. State, 6 S.W. 3d 1, 6 ( Tex. App.- San Antonio 1999, pet. ref'd) citing Jackson v. Virginia, 443 U.S. 307, 315-15,99 S. Ct. at 2781, 2786-88,61 L. Ed.2d 560 (1979)  Appellant argues no rational trier of fact could have found the essential elements of the offense in the instant matter beyond a reasonable doubt. (Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Lacour v. State, 8 S.W. 3d 670,671 (Tex. Crim. App. 2000)  Appellant argues the element of

29.

recklessness was not met regarding Appellant's actions in regard to feeding the child. Because of this, appellant argues that she should have been convicted for the lesser-included offense of endangerment of a child. Appellant argues a conviction for manslaughter requires proof that she recklessly caused the death of her child. Tex . Penal Code Ann. § 19.04(a) (West 2011).

> "A person acts recklessly when [H]e is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." Tex . Pen . Code Ann. § 6.03(c) (West 2011).

The jury was authorized to find appellant committed one of three alternate forms of reckless conduct: (1) providing inadequate nutrition; (2) or fluids ; (3) or medical care., thereby causing the death of her child.. Appellant is aware the verdict must stand if the evidence is sufficient to support any of the reckless acts as charged. Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991). Several witnesses testified the appellant fed her child appropriately and cared for her child by seeking medical help.

Officer Hennigan testified that State's Exhibit 31 was Gerber oatmeal cereal and State's Exhibits 32 through 35 were various brands of formula, all being partially consumed. (RR Vol. 5, p. 87-94) The officer could not support the State's

argument that photographs at the home does not support regular feedings. He did not look in the outdoor garbage can and presumed if there were diapers there, someone would have taken photographs. (RR Vol. 5, p. 109) He stated that he did not look under the pile of items in the stroller, in bathroom drawers, nor under the bed. (RR Vol. 5, p. 104-110) Linda Joyce Bankhead, Ms. Jackson's aunt stated that Ms. Jackson fed and changed the child. She suggested that the baby might grow better with cereal. (RR Vol. 5, p. 126-130) Ms. Bankhead observed that the parents had a trash bag full of diapers and she once had bought formula for them. (RR Vol. 5, p. 141-145) Ms. Bankhead had raised five children, she stated she would know if something was wrong, and would have called an ambulance or taken the baby to the emergency room herself if she thought anything was life threatening. She did not see anything alarming except his weight and stated she had pushed them to take the child to a doctor. (RR Vol. 5, p. 154-157) She stated that the parents were responsive about changing his diaper and regularly fed him. (RR Vol. 5, p. 159-160)

Sharon Shaw, Custodian of Records for the Health District in Angelina County, Administrator of the Health District, spoke also on behalf of the WIC program. (RR Vol. 5, p. 195-207) She stated The Angelina County Health District didn't have any records for I. J. (the child), but were asked to make him an appointment and transfer information from another WIC program in South Texas. The child's first appointment would have been on October 14, 2013, at the request of Ms. Jackson on October 4. Records were received October 9. Dr. Handley, testified as she was shown State's Exhibit No. 34, one of the containers of formula, and stated that it should take about 10 days to use that entire container. When shown State's Exhibit 31, the Gerber oatmeal cereal, she said although she would not normally recommend the cereal for under four months of age, she had told people to use

31.

cereal if their baby has severe reflux and they're losing weight to help the milk to stay down. She stated she has recommended this for babies as young as two months or younger.(RR Vol. 5, p. 242-244) When shown State's Exhibit No. 28, the Dr. identified one bottle that would be appropriate for feeding a newborn. (RR Vol. 5, p. 250-253) The Dr. agreed that if the parents just moved here, couldn't afford a doctor, and hadn't been accepted to Medicaid, it would be possible to fall through the cracks regarding obtaining medical help.( RR Vol. 6, p. 25-27)

Dr. Schoppe, who did the autopsy, and determined cause of death as malnutrition could not determine whether processed food was in the bowels of the child. She said if the baby took a couple of ounces of formula four to five hours before it's death, you would not expect to find a lot in the stomach. (RR Vol. 6, p. 92) Detective Malone determined that a Dr.'s appointment was made, but was recorded as a no-show. Both parents stated that the baby had seen a doctor, but did not provide a name or location of a doctor visit. (RR Vol. 6, p. 107-112)

The appellant told Misty Davis that she was in jail for neglect for not feeding her baby. The witness stated that Ms. Jackson had told her that she and a 15-year old cousin of hers fed the baby. The morning of the child's death, Ms. Davis related Ms. Jackson told her she had heard a gasping sound from the baby and that she had moved his limbs, his arms and legs, and they were just falling. She thought he was okay, so she was trying to make him laugh. After that she gave the baby to Mr. Tolliver, and Mr. Tolliver hollered that something was wrong with the baby and that to call 911. (RR Vol. 6, p. 132)

Ms. Jackson said that throughout the night Mr. Tolliver would be at work, and that she would stay up all night. The 15-year old cousin fed the baby in the evening times, and then during the day she just slept. And when the baby started

32.

whimpering or crying when he was hungry, that she would just give him a pacifier. (RR Vol. 6, p. 133) Ms. Davis stated that Ms. Jackson told her that she had multiple different cans of formula that she kept on top of her refrigerator that different people had given her but she hadn't been to any doctor visits. (RR Vol. 6, p. 134) Ms. Levine testified that there was plenty of food and plenty of diapers in the house and that the baby didn't go without food. (RR Vol. 7, p. 11) Ms. Levine stated that she and the parents fed the baby. (RR Vol. 7, p. 12) Ms. Levine stated that she called Angelina County Health District for an appointment, but they told her that they couldn't do anything for him until he was two months old. (RR Vol. 7, p. 13)

Howard Taylor stated he loaned Mr. Tolliver and Ms. Jackson money for baby items which they bought.. (RR Vol. 7, p. 37) Mr. Tolliver stated that there was always food in the house for the baby. (RR Vol. 7, p. 48) The baby wipes and diapers were stored in a green tub in the closet with items stacked on top. (RR Vol. 7, p. 49) He, Ms. Jackson and Ms. Bankhead thought the baby was small because he is small. (RR Vol. 7, p. 57-59) , Mr. Tolliver stated that the baby was fed quite a bit. He wasn't aware how many ounces he was fed daily, but he was fed every time they thought he should be fed. After the baby was fed, he would sleep. He also stated that he and Ms. Jackson took turns changing the diapers, probably more than six times a day. (RR Vol. 7, p. 61-62) Mr. Tolliver stated that Ms. Jackson told him that the baby had seen a doctor before they moved to Lufkin. (RR Vol. 7, p. 70) He believed Ms. Jackson when she told him that she had fed the baby during the day and he saw her feeding the baby. (RR Vol. 7, p. 72-73)

About a week before the child's death Mr. Tolliver said that Child Protective Services came to the residence and they did not take any action and were able to see I. J. ( the child) He didn't know the purpose of the visit. CPS took pictures and

33.

did not show any alarm at the baby's condition. (RR Vol. 7, p. 83-87)

The appellant stated in a letter, "I know that we didn't do anything to hurt our baby. Our baby had food and everything." (RR Vol. 7, p. 100, 102). She did admit in another letter to the father that she did have responsibility. (RR Vol. 7, p. 100) Appellant argues she recognizes that she was negligent.

Because the jury is the ultimate fact finder, it can choose to believe all, some, or none of the testimony presented by the parties. Chambers v. State, 805 S.W.2d 459, supra. The appellant admitted her negligence as offered above. The testimony as outlined shows she was feeding the child as best she knew how. She was concerned with the child's weight as she tried to use cereal to help the child gain weight. She did get her friend to call for a Dr. appointment. She did get her records transferred to get WIC in Lufkin. She was observed by several people as previously outlined to be active in feeding the child.

Appellant agrees that malnutrition caused the child's death. The testimony supports that the appellant was trying to feed and care for her child and get medical attention for her child as set out above. Appellant argues this evidence was disregarded by the jury. Appellant argues there were no acts associated with her omissions. Winfrey v. State, 323 S.W.3d 875, 882 (Tex.Crim.App.2010). " She did several acts of feeding. The state argues that her feeding care was reckless as

34.

the child did not get enough of formula. Appellant argues any amount of food fed to the child could not have caused the death of the child as any amount of food fed to the child would have provided some nutrition and staved off malnutrition and dehydration, not caused these conditions. Appellant argues her action in some manner actually prolonged the child's life to at least two months. Appellant argues the jury although permitted to draw reasonable inferences from the evidence, should not be permitted to draw conclusions based on speculation. Hooper v. State, 214 S.W.3d 9, supra. Appellant admits she was negligent in not giving the child enough food but was not reckless in regard to feeding the child or seeking medical attention for the child. Appellant argues the jury speculated and did not base their decision to convict her and not the father when both parties lived in the same house for the duration of almost two months. How is it that the father is not reckless in this matter if the mother is. There is simply no evidence in the record that in the course of starving or medically neglecting her son, appellant engaged in any type of reckless behavior that caused her son's death. Further there is not any evidence from which a jury could reasonably make this inference. Appellant therefore argues fails to establish an essential element of the charged offense of manslaughter by not recklessly causing the child's death.

35.

Appellant is aware this court will sustain the conviction "unless it is found to be a verdict that is not rational or not supported by more than a "mere modicum of the evidence." Moreno v. State, 755 S.W. 2d 866,867 (Tex. Crim. App. 1988). Appellant understands this court will not re-weigh the evidence or substitute its judgment for that of the fact finder. Johnson v. State, 967 S.W.2d 410, 412 (Tex. Crim. App. 1998). Appellant realizes that any 'reconciliation of conflicts in the evidence is within the exclusive province of the fact finder. Mosley v. State, 983 S.W.2d 249,254 (Tex. Crim. App. 1998).

In the instant matter, the jury heard from several witnesses as outlined previously and all who had an opportunity to observe her actions and that of her husband including the Child including Child Protective Services. For the reasons stated appellant argues that the evidence is legally insufficient to sustain the jury's finding of guilt.

PRAYER

Appellant Dequisha Jackson, request that the judgment rendered by the trial court on December 17th,2014 be reversed and appellant acquitted. Alternatively, appellant request this Honorable court to reform the judgment and find the appellant guilty of endangerment of a child and remand this matter for sentencing. Lastly, Appellant requests this Honorable Court grant such other and further relief

to which Appellant is justly and equitably entitled.

Respectfully considered,

*/S/ John D. Reeves*
JOHN D. REEVES

Attorney at law
1007 Grant Ave.
Lufkin, Texas 75901
Phone: (936) 632-1609
Fax: (936) 632-1640
SBOT # 16723000

tessabellus@yahoo.com
ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I, John D. Reeves Counsel for appellant hereby certify that this brief exclusive of the rule provisions that do not provide counting contains 10,910 words.

*/S/ John D. Reeves*
John D. Reeves

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Appellant's Brief on this 25th day of August 2015 been forwarded to the State's Counsel, April Ayers-Perez, Assistant District Attorney of Angelina County, aperez@angelinecounty.net, by e-filing.

*/S/ John D. Reeves*
John D. Reeves
Attorney for Appellant, Dequisha Jackson
37.